UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.                                                                              Criminal No. 03-cr-10362-PBS

CHRISTOPHER SUGAR

**Defendant's Supplemental Memorandum in Support of Motion to Suppress Evidence**

## INTRODUCTION

The defendant, Christopher Sugar, was arrested by the Phelps County, Missouri, Sheriff's Department on October 22, 2003 in Rolla, Missouri, for possession of marijuana. The federal authorities were contacted, and Sugar and his passenger, Sean Stark, agreed to cooperate with authorities and to complete the delivery of marijuana to its intended destination in Massachusetts, accompanied by agents from the Drug Enforcement Agency ("DEA"). After cooperating with the DEA, which led to the arrest of three additional co-defendants in Massachusetts, Sugar and Stark were indicted by a Federal Grand Jury on charges of Conspiracy to Distribute Marijuana in violation of 21 U.S.C. § 846, Possession of Marijuana with Intent to Distribute in violation of 21 U.S.C. § 841(a)(1), and Aiding and Abetting in violation of 18 U.S.C. § 2.

Sugar has filed a motion to suppress evidence claiming that the evidence was seized in violation of the Fourth and Fourteenth Amendments to the U. S. Constitution. This supplemental memorandum is filed in support of the defendant's motion to suppress.

## STATEMENT OF FACTS

On October 22, 2003, the defendant, Christopher Sugar, was driving a recreational vehicle ("RV") eastbound on Interstate 44 in Rolla, Missouri. Mr. Sugar, who had written

1

permission from the owner of the RV to drive and use it for a long-distance trip from Arizona to the Northeast United States, had control of the RV and its contents. Accompanying on the trip was his co-defendant, Sean Stark. As they were traveling down a wide divided highway, the vehicle was stopped for a "moving violation." Mr. Sugar does not believe that he committed any moving violation.

Deputy Carmelo Crivello of the Phelps County, Missouri, Sheriff's Department, pulled over the RV. He approached the vehicle and began asking the two men questions, including where they were going. After taking Mr. Sugar's driver's license, the deputy returned to his vehicle to "run the license." Deputy Crivello remained in his car for more that a minute. After that delay, Deputy Crivello returned to the RV and told Sugar and Stark that he was looking for narcotics, and asked if he could search the RV. Sugar denied his request.

At that time, Deputy Crivello took Sugar back to his patrol car and questioned him for over five minutes. Approximately ten minutes after bringing Sugar to the patrol car, Stark walked over to ask how much longer they would be detained. Deputy Crivello informed him that they could go to a restaurant, but that the RV was being detained until a canine unit arrived.

Several minutes later the canine unit, known as "Nitro," arrived, accompanied by several plainclothes officers. Sheriff Don Blankenship, Nitro's "handler," walked Nitro around the RV more than four times. Nitro repeatedly pulled the handler down a hill, and was not focused on the RV. At one point during the walking around, Nitro alerted to something. After approximately two minutes, on or about the fourth trip around the RV, Nitro barked at the front door of the vehicle, at which point the officers entered the RV, without seeking consent from either Stark or Sugar. At no point during this encounter did the officers get a warrant to search the RV. The officers did not bring Nitro into the RV. After they had been in the RV a short

time, the officers came out to ask the men to unlock a closet. Neither Stark nor Sugar had a key, so the officers returned and opened the closet door by "manipulating" the handle. Allegedly as a result of the search of the closet, the officers recovered a firearm and a large quantity of marijuana.

## ARGUMENT

In the case at bar, it is not disputed that a stop for constitutional purposes occurred when Deputy Crivello exited his patrol car and approached the RV. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). It is also indisputable that the defendant was seized and detained by the officer without a search or arrest warrant. The general requirement that a search warrant be obtained is not lightly to be dispensed with, and the burden is on those seeking an exemption from the requirement to show the need for it. "Only where incident to a valid arrest, United States v. Rabinowitz, 339 U.S. 56 (1950), or in 'exceptional circumstances,' Johnson v. United States, 333 U.S. 10 (1948), may an exemption lie, and then the burden is on those seeking the exemption to show the need for it, McDonald v. United States, 335 U.S. 451, 456 (1948)." United States v. Jeffers, 342 U.S. 48, 51, 72 S.Ct. 93, 96 L.Ed. 59 (1951). In the case at bar, the government is unable to meet its burden of proving that the warrantless stop and subsequent search of the vehicle Sugar was driving was reasonable.

I. **THE DEFENDANT HAS STANDING TO CHALLENGE THE INITIAL STOP OF THE MOTOR VEHICLE**

The threshold inquiry in reviewing the validity of a search or seizure is whether the defendant's own Fourth Amendment rights have been violated. United States v. Padilla, 508 U.S. 77, 81-82, 113 S.Ct. 1936, 1939, 123 L.Ed.2d 635 (1993). The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of arrest. United States v. Brignoni-Ponce, 422 U.S. 837, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975). For this reason, it is beyond dispute that a vehicle's driver may challenge his traffic stop. United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989). Thus, Sugar has standing to challenge his traffic stop and subsequent detention.

3

A traffic stop is an investigative detention analogous to a Terry stop. United States v. Soto, 988 F.2d 1548, 1554 (10th Cir. 1993). Its reasonableness is evaluated in two respects: first, whether the officer's action was justified at its inception, and, second, whether the action was reasonably related in scope to the circumstances that first justified the interference. Terry, 392 U.S. at 19-20, 88 S.Ct. at 1878-79, 20 L.Ed.2d 880. The defendant maintains that the stop in the instant case was not reasonable in either respects: he did not commit a traffic violation so the initial stop was not justified, and the subsequent prolonged detention and search of the RV was not reasonably related in scope to the alleged traffic violation.

## II. THE STOP OF THE DEFENDANT'S VEHICLE WAS NOT BASED ON PROBABLE CAUSE

An investigatory stop is justified if the police have a reasonable suspicion, based on specific, articulable facts and reasonable inferences therefrom, that a person has committed, was committing, or was about to commit a crime. United States v. Taylor, 162 F.3d 12, 18 (1st Cir. 1998). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). In the case at bar, the defendant maintains that Deputy Crivello did not have probable cause to believe that he had committed a traffic violation. Because the stop was unlawful, the defendant is entitled to suppression of its fruits. Wong Sun v. United States, 371 U.S. 471, 487-88, 83 S.Ct.407, 417, 9 L.Ed.2d 441 (1963); United States v. Scott, 270 F.3d 30, 40 (1st Cir. 2001).

Initially, the defendant notes that the Eighth Circuit struck down a drug checkpoint program that was run by the same law enforcement agency that stopped the defendant's RV in the case at bar, and on the same Interstate highway. See United States v. Yousif, 308 F.3d 820, 827 (8th Cir. 2002). As the court in Yousif described:

> On April 13, 2000, the Missouri Highway Patrol (MHP) and the Phelps County Sheriff's Department set up a drug interdiction checkpoint at the end of the exit ramp leading uphill from eastbound Interstate Highway 44 ("I-44") to Sugar Tree Road in Phelps County, Missouri (hereinafter "the Sugar Tree Road checkpoint"). The Sugar Tree Road

4

> checkpoint was a so-called "ruse checkpoint" because signs were placed along the highway warning travelers that they were approaching a drug checkpoint further down the highway, yet the checkpoint was actually located on the ramp which exited the highway a short distance past the signs. The Sugar Tree Road exit was chosen as a site for a ruse checkpoint because law enforcement officers believed that I-44 was a commonly used route for transporting drugs, there was little use of the Sugar Tree Road exit for commercial or local traffic, and the end of the ramp was not visible from the highway.
>
> Operation of the Sugar Tree Road checkpoint was governed by a set of standard procedures set forth in a memorandum issued by the MHP on April 4, 2000 (hereinafter "the MHP memorandum"). Pursuant to the MHP memorandum, the following procedures were implemented. Approximately one-quarter mile west of the Sugar Tree Road exit, signs were placed on each shoulder of the road, stating: "Drug Enforcement Checkpoint ¼ Mile Ahead." Further down the road, approximately 100 yards west of the Sugar Tree Road exit, more signs were placed alongside of the road, stating: "Drug Dogs in Use Ahead." The checkpoint was set up at the end of the Sugar Tree Road exit ramp, out of view from I-44. At least two fully marked MHP patrol cars were located at the checkpoint. When a vehicle would arrive at the checkpoint, at least one uniformed officer would approach the driver and ask for his or her driver's license, registration, and – if required by the state of registration – proof of insurance. The officer would also record the license plate number of the vehicle and ask the driver if he or she saw the signs and why he or she exited the highway. Upon perceiving any indication of illegal activity, the officer would question the driver further. If there were any reason to believe that the vehicle contained illegal drugs or other contraband, the officer would ask for consent to search the vehicle. If consent were denied, but the officer still had a reasonable suspicion of unlawful activity, the officer would ask the occupants to step out of the vehicle. The officer would then turn off the ignition and have a drug dog walk around the exterior of the vehicle. If the dog failed to alert, and the officer had no other reason to hold the vehicle and its occupants, they would be allowed to leave.

*Id.* at 823-24. Following the United States Supreme Court's decision in <u>City of Indianapolis v. Edmond</u>, 531 U.S 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000), the Eighth Circuit in <u>Yousif</u> held that absent a "quantum of individualized suspicion," the police could not stop cars or detain their occupants. 308 F.3d at 827.

With the door seemingly closed on its roadblock program, the Phelps County Sheriff's Department has nevertheless continued to use the drug checkpoint ruse but with a slight change in tactics. Instead of stopping cars with out-of-state license plates, law enforcement officials simply follow the vehicles until they allegedly "observe a violation" of the traffic laws and then stop the vehicles.

5

Of course, the police may stop a vehicle if they have probable cause to believe that a traffic offense has occurred, even if the offense is minor and the stop is merely a pretext to investigate other crimes. *See* Arkansas v. Sullivan, 532 U.S. 769, 772 (2001); Whren, 517 U.S. at 813; United States v. Andrade, 94 F.3d 9, 10-11 (1st Cir. 1996). The officers' subjective motivation when making a traffic stop is deemed irrelevant for Fourth Amendment purposes, as long as their conduct does not exceed what they are objectively authorized to do. Andrade, *supra*. However, in the absence of a traffic violation or some other reasonable suspicion of criminal activity, the detention of a motorist violates the Fourth Amendment. United States v. Lopez-Soto, 205 F.3d 1101, 1106 (9th Cir. 2000); United States v. Lopez-Valdez, 178 F.3d 282, 287-89 (5th Cir. 1999); United States v. Hugenin, 154 F.3d 547, 558 (6th Cir. 1998).

As noted above, Deputy Crivello alleged that he stopped the defendant for failure to drive in a single lane. The defendant disputes that contention. He claims that he was aware that a police vehicle was following him and that he took extra care to avoid violating any traffic laws. Even if this Court credits the deputy's contention that Mr. Sugar crossed a lane marker, that observation did not justify the stop. *See* United States v. Freeman, 209 F.3d 464, 466 (6th Cir. 2000) (holding that one isolated incident of partially weaving into the emergency lane for a few feet and an instant in time does not constitute a failure to keep the vehicle within a single lane); United States v. Gregory, 79 F.3d 973, 978 (10th Cir. 1996) (same).

Finally, although the Supreme Court has authorized police to make pretext traffic stops, court have warned against the abuse of such authority. *See* Freeman, 209 F.3d at 467-72 (Clay, C.J., concurring). In the case at bar, the defendant contends that the Phelps County Sheriff's Department has used such authority to make questionable traffic stops, followed by searches for contraband. In effect, the sheriff has resurrected the illegal practiced condemned in Edmond and Yousif, albeit in slightly altered form.

### III. THE DEFENDANT HAS STANDING TO CHALLENGE THE SUBSEQUENT SEARCH OF THE MOTOR VEHICLE

The defendant further challenges the search of the RV as violative of his Fourth Amendment rights. For purposes of standing, and subject to the protections and immunities of the Fifth Amendment and Simmons v. United States, 390 U.S. 377 (1968) respectively, the defendant hereby asserts that his Fourth Amendment rights were personally violated by the search and seizure of the RV in that he had a legitimate expectation of privacy in the vehicle in which he was present with the permission of its owner. Further, the defendant asserts a possessory interest in the vehicle and its compartments, and the alleged contraband located therein.

In order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched and that his expectation is reasonable; "i.e., one which has 'a source outside the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" Minnesota v. Carter, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (quoting Rakas v. Illinois, 439 U.S. 128, 143-44, 99 S.Ct. 421, 430-31, 58 L.Ed.2d 387 (1978)).

The First Circuit has held that "at least the following factors are relevant to a privacy expectation: legitimate presence in the area searched, possession or ownership of the area searched or the property seized, prior use of the area searched or the property seized, ability to control or exclude others' use of the property, and a subjective expectation of privacy." United States v. Lochan, 674 F.2d 960, 965 (1st Cir. 1982). Mr. Sugar exhibited a subjective expectation of privacy in the recreational vehicle when he loaded it with his personal belongings. Additionally, the fact that he was driving the RV when it was stopped, that he had permission to drive it, that he had been on a trip taking him several thousand miles from home, and that he had slept in the sleeping quarters of the vehicle all weigh in favor of a legitimate privacy interest.

That expectation of privacy was legitimate as well: society has long recognized as valuable the right of an individual to be free of unreasonable police intrusion in his or her vehicle. As the Supreme Court instructed in Delaware v. Prouse, 440 U.S. 648, 662-63, 99 S.Ct. 1391, 1400-01, 59 L.Ed.2d 660 (1979):

7

> An individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation. Automobile travel is a basic pervasive, and often necessary mode of transportation t and from one's home, workplace, and leisure activities. Many people spend more hours each day traveling in cars than walking on the streets. Undoubtedly, many find a greater sense of security and privacy in traveling in an automobile than they do in exposing themselves by pedestrian or other modes of travel. Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed. As Terry v. Ohio, *supra*, recognized, people are not shorn of all Fourth Amendment protection when they step from their homes onto the public sidewalks. Nor are they shorn of those interests when they step from sidewalks into their automobiles.

A driver's expectation of privacy in his vehicle is reasonable if he proves lawful ownership or possession at the time of the search. United States v. Miller, 821 F.2d 546, 548-49 (11th Cir. 1987) (an accused who borrows a car from a friend has standing to assert an expectation of privacy); United States v. Griffin, 729 F.2d 475, 483 n.11 (7th Cir.), cert. denied, 469 U.S. 830, 105 S.Ct. 117, 83 L.Ed.2d 60 (1984) (accused who borrowed a car from his brother had a protectable privacy right); United States v. Williams, 714 F.2d 777, 779 n.1 (8th Cir. 1983) (where the accused had occasionally borrowed the vehicle form the owner and had obtained permission from the owner to use the vehicle on the day the vehicle was searched, the accused had a protectable privacy interest in the vehicle). *Cf.* United States v. Garcia, 897 F.2d 1413, 1418-19 (7th Cir. 1990) (holding that where the government failed to prove that the vehicle driven by the accused was stolen, the accused possessed protectable privacy rights because it was presumed that the accused had the owner's permission to use the vehicle). *See also* Rakas, 439 U.S. at 143 n. 12 ("one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude"); United States v. Orrego-Fernandez, 78 F.3d 1497, 1502 (10th Cir. 1996) (defendant had reasonable expectation of privacy in truck when he demonstrated that truck's actual owner had given him permission to use the vehicle). As the authorized driver of the recreational vehicle, Mr. Sugar maintained an

8

interest in that vehicle, an interest based on legitimate property rights that society is prepared to recognize.

Mr. Sugar had a reasonable expectation of privacy in the recreational vehicle and the property stored within it. Thus, in addition to his standing to challenge the stop and his detention, he also has standing to challenge the subsequent search of the vehicle.

IV. **DEPUTY CRIVELLO IMPERMISSIBLY EXCEEDED THE SCOPE OF THE TRAFFIC STOP BECAUSE MR. SUGAR'S CONTINUED DETENTION WAS NEITHER SUPPORTED BY REASONABLE SUSPICION NOR TRANSFORED INTO A CONSENSUAL ENCOUNTER**

An officer, such as Deputy Crivello in this case,

> conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. When the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.

United States v. Gonzalez-Lerma, 14 F.3d 1479, 1483 (10th Cir. 1994) (quotation omitted). In the instant case the routine traffic stop was complete after Deputy Crivello obtained Sugar's license and cited him. At that point Crivello should have returned Sugar's license and permitted him to leave because he had no reasonable objective grounds to continue to detain him. Instead, Deputy Crivello told Sugar and Stark that they could go to a nearby restaurant, but they had to leave the RV with him while he waited for the canine unit. At this point, the two men, who were 1,500 miles from home, were not legitimately free to leave, and were still being detained.

While an officer is processing an efficient, timely registration check, the length of the detention is presumptively within the bounds of the Fourth Amendment. United States. v. Chavis, 902 F.Supp. 111, 114 (E.D. Tex. 1995), aff'd, 91 F.3d 140 (5th Cir. 1996), citing United States v. Shabazz, 993 F.2d 431, 437 (5th Cir. 1993). In Chavis, as here, the defendant was already in custody by the time the vehicle registration check began. That court held, therefore, that the vehicle registration check could not be used to justify the continued detention. "The government can hardly be heard to argue that Officer Davis was detaining Chavis in order to run a vehicle registration check when the check was not even begun until

twenty-plus minutes had elapsed and Chavis was already in custody." Chavis, 902 F.Supp. at 114. The same is true in the instant case, and the questions that Deputy Crivello asked Sugar and Stark had nothing to do with the supposed traffic violation.

The United States Supreme Court has held in no uncertain terms that an unconstitutional seizure can occur even if the police detain a person only "momentarily, without reasonable, objective grounds for doing so." Florida v. Royer, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983). This principle is illustrated in United States v. Buchanon, 72 F.3d 1217 (6th Cir. 1995). In that case, the police happened upon a pair of disabled vehicles on an Ohio interstate. The drivers asked the officer if he could call a tow truck. The officer called for the truck and told the drivers that it would be approximately 45 minutes before it arrived. While waiting for the tow truck to arrive, the police decided to conduct a dog sniff on the vehicles, even though they had no reasonable suspicion that any type of criminal activity was afoot. In preparation for the test, the police required the drivers and passengers to stand away from the vehicles during the test. Two other officers stood between the men and the vehicles. This "seizure" of the men lasted approximately two minutes, far shorter than the illegal detention of Christopher Sugar and Sean Starks. Despite the brevity of this seizure, the Sixth Circuit correctly held that because the troopers had no reasonable suspicion to detain the men, their detention, even for a few minutes, was illegal and the evidence found as a result of the exploitation of the illegal seizure must be suppressed. Id. at 1226.

Similarly, in United States v. Gordon, 917 F.Supp. 485 (W.D. Tex. 1996), the court suppressed evidence found by exploiting a two-minute detention unsupported by reasonable suspicion. In that case, the police stopped a car on Interstate 10 for a minor traffic infraction. Like the instant case, after the initial traffic investigation was complete the officer requested consent to search the vehicle. The driver declined. The officer then told the driver he was free to go, but the vehicle was going to be detained. The detention was not based on any reasonable suspicion. Id. at 487. Just two minutes later a dog alerted on the vehicle and a quantity of drugs was subsequently found. The government argued that "any detention between the time of the issuance of the Warning Citation and the running of the K-9 was

minimal and did not significantly increase the level of intrusion incurred as a result of the stop." *Id*. The Gordon court correctly found that a Fourth Amendment violation is not dependent on the length of an illegal detention. The court explained that

> it is irrelevant that the detention lasted only two minutes…. At the point that Gordon signed the Warning Citation, and refused to consent to a search of his vehicle, the encounter was over. Absent reasonable suspicion for a continued detention of the vehicle, Gordon was free to leave the scene.

*Id*.

United States v. Lee, 73 F.3d 1034 (10th Cir. 1996), is also instructive here because it too involved an improper extension of a traffic stop. In Lee, a Utah state deputy stopped a vehicle with California license plates for improper lane use. The deputy obtained the driver's license but the driver did not have the vehicle registration. The driver told him the car was leased. The deputy determined this was true and that the defendant's drivers' license was valid. The officer completed his warning ticket and had no further reason to detain the vehicle and its occupants. At that point, however, he asked about guns and drugs and requested permission to search the vehicle. The Tenth Circuit held that "[a]fter having his suspicions allayed, Deputy Barney could not further detain Defendants or search Defendants unless he had probable caused or their consent." *Id*. at 1039.

In the instant case, the continued questioning of Sugar and Stark was not reasonably related to the purpose of the initial stop. Even if this Court concludes that something occurred during the time the deputy was questioning the defendants to create reasonable suspicion, this was a period of unlawful detention beyond the conclusion of the traffic stop. Therefore, any reasonable suspicion or probable cause developed during this time is the illegal fruit of the poisonous tree and this Court cannot consider it. Wong Sun, *supra*; Scott, 270 F.3d at 40.

A ruling from the Court that a law enforcement officer can exceed the bounds of a legitimate traffic stop and continue to detain drivers and their passengers without reasonable suspicion, and that information elicited during that continued detention can be used to for the "reasonable suspicion"

11

needed to support further police action, will be inviting officers to extend routine traffic stops, without reasonable suspicion, in the hopes that they can then develop such suspicion.

### V.   THE SEARCH OF THE RV WAS NOT SUPPORTED BY PROBABLE CAUSE BECAUSE ANY ALERT BY THE CANINE KNOWN AS "NITRO" WAS NOT A RELIABLE DETERMINATION THAT THE RV CONTAINED CONTRABAND

Even if this Court finds that the initial stop and Sugar's continued detention were lawful, the government has the burden of proving the warrantless search and seizure of the RV was based on probable case. Carroll v. United States, 267 U.S. 132, 155-56, 45 S.Ct. 280, 286, 69 L.Ed. 543 (1925). This is true when, as in the case at bar, probable cause is based on the alleged "alert" of a dog. See United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2s 110 (1983).

The finding of probable cause is contingent on the reliability of the alerting dog. See United States v. Colon, 845 F.Supp. 923, 928 (D.P.R. 1994) (lack of evidence in the record pertaining to ... general reliability of the canine unit performing the sniff precludes determination that government has shown probable cause); United States v. $67,220, 957 F.2d 280, 285 (6th Cir. 1992) (for positive dog reaction to support a determination of probable cause, the training *and reliability* of the dog must be established) (emphasis added); United States v. Spetz, 721 F.2d 1457, 1464 (9th Cir.), overruled on other grounds, United States v. Bagley, 765 F.2d 836 (9th Cir. 1985) (a validly conducted dog sniff can supply the probable cause necessary for issuing a search warrant *only if sufficient reliability* is established by the application for the warrant) (emphasis added); Cf. Horton v. Goose Creek Indep. Sch. Dist., 690 F.2d 470 (5th Cir. 1982) (remanded for trial court to evaluate dog's reliability before determining whether an alert gave rise to reasonable suspicion in civil case); see also 1 Wayne R. LaFave, Search and Seizure, § 2.2(f) (2d Ed. 1987) (in light of the careful training which these dogs receive, an "alert" by a dog is deemed to constitute probable cause for an arrest or search *if a sufficient showing is made as to the reliability of the particular dog* used in detecting the presence of a particular type of contraband) (emphasis added).

Courts holding that probable cause that is established by a dog alert almost unanimously refer to "trained" narcotic dogs. See, e.g., Place, 462 U.S. at 706 (canine sniff by a "well-trained narcotics detection dog" did not require opening luggage); Florida v. Royer, 460 U.S. 491, 505 (1983) (courts are not strangers to the use of "trained" dogs to detect the presence of controlled substances in luggage); United States v. Rodriguez-Morales, 929 F.2d 780 (1st Cir. 1991) (so long as an automobile is lawfully impounded, a canine sniff by a "trained" drug dog does not implicate the fourth amendment). The implication of these cases is obvious: the government has the burden of demonstrating that the dog has been properly trained. Without a clear record evidencing the dog's training to detect contraband, any alleged alert cannot constitute probable cause.

The government has responded to defendant's discovery requests for records regarding Nitro's training by stating that the facility where he was trained, Lead Canine in Lincoln Arkansas, closed in 2003 and that no records were kept. The defendant thus has no way to determine whether, for example, Nitro was trained to search only in buildings, or around vehicles where more distractions exist. "The fact that a dog is certified should not be sufficient in and of itself to establish probable cause." United States v. Florez, 871 F.Supp. 1411, 1420 (D.N.M. 1994). Certified dogs have been known to falsely alert. See Doe v. Renfrow, 475 F.Supp. 1012 (N.D. Ind. 1979), aff'd in part, 631 F.2d 91 (7th Cir. 1980) (no drugs found on thirty-three out of fifty junior high and high school students to which narcotics dogs alerted); United States v. Brown, 731 F.2d 1491, modified, 743 F.2d 1505 (11th Cir. 1984) (no drugs found after narcotics dog alerted to luggage at airport); United States v. Young, 745 F.2d 733 (2d Cir. 1984) (no drugs found after narcotics dog alerted to defendant's apartment).

Where documentation on a narcotics dog is absent or incomplete, a proper evaluation of a dog's reliability cannot take place. See Horton, 690 F.2d at 470 (holding assertion that dogs were "quite reliable" insufficient where no comprehensive records kept of those incidents where dogs' falsely alerted and remanding for a development of the record on the dogs' reliability). Because the government cannot

show that the dog, Nitro, was reliable, it cannot meets its burden of showing probable cause to search the RV.

## CONCLUSION

The government has failed to meet its burden of proving that Deputy Crivello's detention of Mr. Sugar was both lawful at its inception and reasonably related in scope to the circumstances that justified the interference in the first place. Furthermore, the government cannot meet its burden to show there was probable cause to search the vehicle. For all the reasons cited above, the defendant's motion to suppress should be allowed.

Respectfully submitted,
Christopher Sugar
By his attorney,

Mark W. Shea
BBO No. 558319
Shea, LaRocque, & Wood, LLP
47 Third Street, Suite 201
Cambridge MA  02141-1265
telephone:      617.577.8722
facsimile:      617.577.7897
e-mail:         mwshea@slrw.net

14